DUDLEY R. ROUNDTREE, Administrator,

*v.*

MARVIN BAKER, Administrator.

| 52 | 241 |
|---|---|
| 146 | 529 |
| 52 | 241 |
| 159 | 470 |
| 52 | 241 |
| 179 | 597 |
| 52 | 241 |
| 193 | [1]107 |

1. CONFLICT OF LAWS—*when the lex loci contractus governs.* Where an instrument executed in the State of Kentucky, prior to the abolition of slavery in that State, for the purchase price of a negro slave sold there, was sued upon in this State: *Held*, that, the contract being valid and enforcible in the State where it was made, will be enforced in our courts, under the law of comity, notwithstanding such a contract could not have originated here by reason of slavery being prohibited in this State.

2. SAME—*effect of the abolition of slavery after the contract was made.* The abolition of slavery in Kentucky, after the making of the contract, did not affect its validity or impair the consideration upon which it was based.

WRIT OF ERROR to the Circuit Court of Knox county; the Hon. ARTHUR A. SMITH, Judge, presiding.

The question presented in this case is, whether a contract executed in a State where slavery existed, for the purchase price of a negro slave, will be enforced in the courts of this State.

Mr. A. M. CRAIG, for the plaintiff in error.

It is a general rule of law, well settled, that the law of the place where the contract is made, and not where the action is brought is to govern in enforcing and expounding the contract, and in determining its validity. *Bradshaw* v. *Newman*, Breese, 94; *Stacy* v. *Baker*, 1 Scammon, 417; *Phinney* v. *Baldwin*, 16 Ill. 108; *Cox et al*, v. *The United States*, 6 Peters, 172.

This contract was made in Kentucky, and was a valid contract by the laws of Kentucky. If an action had been brought on this contract in Kentucky, the courts of that State must have sustained its validity, and enforced its execution; and this court can judicially take notice of this contract only by the

light of the laws where the contract was made. *Smith et al.*
v. *Whitaker et al.* 23 Ill. 367.

The law of the remedy is no part of the contract. *Wood
et al.* v. *Child 'et al.* 20 Ill. 209. See, also, 2 Salkeld, 666;
*Hone* v. *Ammons,* 14 Ill. 29; *Commonwealth* v. *Aves,* 18 Pick.
215.

Messrs. HANNAMAN & KRETZINGER, for the defendant in
error.

The recognition of comity is based on the principle of reci-
procity, and reciprocity in this country must be founded on
the consent of the States to the legality and justness of the
subject matter of contracts, and the equal mutual benefits or
rights to be yielded or enjoyed. No such relation can exist
between a slave-holding and non-slave-holding State.

The contract sought to be enforced contains the terms of
the sale and purchase of a negro girl. It bears the taint of
slavery, and slavery is offensive to the good morals of a people.

Sir William Blackstone declares, in his Coms. v. 1, p. 423,
that slavery rests on an unsound foundation, and insists that
it is repugnant to reason, and exists in utter violation of the
natural laws. *Fahrs* v. *Cochran,* 3 Dowl. and Ryl. 679; S. C.
2, Barn. and Cressw. 448; Wayland's Elmt. of Moral Science,
209; Rutherford's Inst. Nat. Law, bk. 1, c. 20; Stroud's
Sketch of the Laws relating to the laws of slavery in the
United States, 25.

It is well settled by the current of authorities, that comity
will be denied upon general principles, by the courts of free
States, on contracts arising upon slavery. And still less is
the doctrine of comity admissible in the case at bar, when the
contract, itself, by its express terms, is opposed to the policy
which the people of Illinois thought proper to adopt, in the
foundation of their State government; and in direct violation
of the express provisions of sec. 1 and 2 of article 6. of the
original constitution of Illinois.

No State is bound, or ought to enforce or hold valid, in its courts of justice, any contract which violates any provision of its own statute law; and if any contract is entered into without the State, and the consideration moving to either party, is positively forbidden by the written law of the State where the litigation arises, a court of justice will not enforce it, and surely it ought not, when such enforcement would be a violation of the law which it is bound to administer.

Mr. Justice STORY says, "that the state of slavery will not be recognized in any country whose institutions and policy prohibit slavery." Story's Conflict of Laws, sec. 104. And further, to the same point, in the same work, sec. 253, it is stated that "contracts to carry into effect the African slave trade, or the rights of slavery in countries which refuse to acknowledge its lawfulness, &c. would be held utterly void, whatever might be their validity in the country where they are made, as being inconsistent with the duties, the policy, or the institutions of other countries where they are sought to be enforced."

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was an action of debt, brought by plaintiff in error, in the Knox circuit court, against defendant in error, on a writing obligatory, entered into in the State of Kentucky, by Turner R. Roundtree to Dudley Roundtree, given for the price of a negro girl sold by the latter to the former. It appears, the instrument sued on bears date the tenth of October, 1833; is for four hundred dollars, payable in equal annual installments of twenty dollars each, the first payable on the last day of December, 1834. It was stipulated that plaintiff in error is the administrator of Dudley Roundtree, deceased; that the girl, Eliza, named in the writing obligatory, was a slave in the State of Kentucky, owned by Dudley Roundtree, and that, as such, by the laws of Kentucky, she was liable to sale at the time the instrument was executed. That she was sold and

delivered in the State of Kentucky by Dudley Roundtree to Turner Roundtree, who resided in this State, on the tenth of October, 1833, and the writing obligatory was given in Kentucky on the purchase of the girl. Defendant below filed a plea of *nil debet* upon which there was an issue to the country; next, a plea of the statute of limitations; third, that the instrument was given for the purchase of a negro girl, and hence the consideration had failed; fourth, that the writing obligatory was given for the balance of the price of a negro girl, who was free and was sold as stated in the instrument sued upon, and the consideration had therefore failed. To the second plea, plaintiff replied that the cause of action had accrued within sixteen years. Plaintiff below interposed a demurrer to the third and fourth pleas, which was overruled by the court. He then replied to the third plea that, by the laws of Kentucky, the girl was a slave, and liable to be sold as such, and the consideration had not failed; and to the fourth, that the girl was not free, and was under the laws of Kentucky liable to sale, she being a slave. Issues were joined upon these replications.

At the February term, 1869, the cause was tried before the court, without the intervention of a jury, by consent of the parties, when the court found for defendant; a motion for a new trial was overruled, and a judgment was entered in favor of the defendant for costs. The record is brought to this court on error, and we are asked to reverse the judgment of the court below because it is against the law.

It is a general rule, that we look to the law of the place where the contract is entered into, and not where it is to be enforced, to ascertain its validity; and not only so, but in expounding its terms and conditions. *Bradshaw* v. *Newman*, Breese, 133; *Stacy* v. *Baker*, 1 Scam. 417; *Phinney* v. *Baldwin*, 16 Ill. 108. In the case of *Adams* v. *Robertson*, 37 Ill. 45, the rule was announced, that the laws of every country allow parties to enter into obligations with reference to the

laws of the country where such obligations are to be performed, and although such obligations may not be in accordance with the laws of the country where they are entered into, as regards agreements to be performed where they are made, they may be strictly in conformity with the laws of the country where they are to be performed. But there is a limitation on this law of comity which requires that the contract, when entered into, must conform to the laws of the country where made, or else to the laws of the country where it is to be performed. The rights enforced by courts, where the contract is made in one country, to be performed in another, are those given by the laws of the country where the contract was made, and such rights are enforced in the country where the contract is to be performed, not as a matter of strict right, but as a matter of comity extended toward the country in which the contract was made. It was again said, in the case of *Lewis* v. *Headly*, 36 Ill. 433, that it is a presumption of law, where there is no agreement to the contrary, that a contract is to be performed in the country where it is made.

There is to this general rule a further limitation which is, that the courts of one country will not, under this comity, ever execute the criminal or penal laws of another country. *Sherman* v. *Gassett*, 4 Gilm. 521. The general rule has been recognized in the cases of *Forsythe* v. *Baxter* 2 Scam. 12; *Holbrook* v. *Vibbard*, ib. 465; *Chenot* v. *Lefevre*, 3 Gilm. 642; *Strawbridge* v. *Robinson*, 5 Gilm. 470; *Schuttler* v. *Piatt*, 12 Ill. 419; *Crouch* v. *Hall*, 15 Ill. 264, and the case of *Sherman* v. *Gassett*, 4 Gilm. 521, referred to above. These cases, determined in our own court, all concurring, fix and establish the rule so firmly that nothing short of legislative enactment should overturn or disturb it. A different rule would work manifest injury to commerce, trade, and the various pursuits of life. If our courts could refuse to enforce contracts made and entered into in other countries and states, because the laws governing them where made are different from or repugnant to our laws, a vast amount of injustice would ensue,

as the laws of no two countries coincide in every particular in but a few cases. The exigencies of commerce and the general trade of the world have compelled the adoption and enforcement of this rule.

If we refer to the adjudged cases in other courts, whether of Great Britain or the various States of the Union, we find that the rule has been adopted that the laws of one State, entering into and forming a part of the contract, will be enforced in the courts of another State; and it is recognized to be on the principle of comity—not the comity of the courts, but the comity of the nation—which is administered and ascertained in the same way, and guided by the same reasoning by which principles of the municipal law are ascertained and guided. Story's Conflict of Laws, sec. 38; *United States Bank of Augusta* v. *Earle*, 13 Peters, 519. The rule stated by Huberus and approved by Story, is this: "That the rules of every empire, from comity, admit that the laws of every people, in force within its own limits, ought to have the same force everywhere, so far as they do not prejudice the powers or rights of other governments, or their citizens." Story Conf. Laws, sec. 29.

In France, the State, as it was organized before the revolution, was divided into a large number of provinces governed by different laws and customs, and was at an early period obliged to sanction such authority through its courts, in order to provide for the constantly occurring claims of its own subjects, living and owning property in different provinces, in a conflict between the different provincial laws. Ib. sec. 24. If the attainment of justice required the application of the rule in France, the peculiar frame of our government certainly imperatively demands its application and enforcement between the different States of the Union. And we have seen that it was fully recognized by the supreme court of the United States. In the absence of any positive statutory rule affirming or denying, or restraining such operation of foreign laws, courts of justice presume the tacit adoption of them by their own

government, unless they are repugnant to its policy or prejudicial to its interests.    Ibid. sec. 38.

Our legislature having declared no rule on the subject, our courts, like others, have adopted the rule, with the limitation that they will never enforce the criminal or penal laws of another country.  Nor would they enforce and compel the specific performance of a contract under the laws of another State, when the laws are clearly repugnant to our policy and interests.    Our courts would not enforce a contract for the sale of a slave, whether made in this State, where slavery has always been prohibited, or in a State where such contracts are binding, because it is against public policy.    But after the parties have fully executed their contract, and a note is given for the price, under this comity which exists between the States of the republic, the note may be collected, and it is not for us, from caprice, or because we may abhor the system of slavery and the sale of human beings, to refuse to lend the aid of the courts for the collection of the money. It is not against the policy of our State to allow its collection, nor is it contrary to the interests of our citizens.    Under the laws of Kentucky the sale was authorized, and there was a sufficient consideration.

In the case of *Smith* v. *Brown*, 2 Salk. 666, suit was brought for the price of a negro slave, and it was held that, although slavery could not exist in England, yet when a slave, by the laws of Virginia, had been sold in London, the seller might recover. So, in the case of the *Commonwealth* v. *Aves*, 18 Pick. 215, the court held that, " though slavery is contrary to natural right, the principles of justice, humanity and sound policy, as we adopt them and found our laws upon them, yet not being contrary to the laws of nations, if any State or community sees fit to establish and continue slavery by law, so far as the legislative power of that country extends, we are bound to take notice of the existence of those laws, and we are not at liberty to declare and hold an act done within those limits unlawful and void upon our

views of morality and policy, which the sovereign and legislative power of the place has pronounced to be lawful."

" So, in pursuance of the well known maxim, that in the construction of contracts the *lex loci contractus* shall govern, if a person having, in other respects, a right to sue in our courts, shall bring an action against another, liable, in other respects, to be sued in our courts, upon a contract made upon the subject of slavery, in a State where slavery is allowed by law, the law here would give it effect. As, if a note of hand made in New Orleans were sued on here, and the defense should be that it was on a bad consideration, or without consideration, because given for the price of a slave sold, it may be well admitted that such a defense could not prevail, because the contract was a legal one by the law of the place where it was made."

· In the case of *Hone* v. *Ammons*, 14 Ill. 29, the court was divided, but Mr. Justice CATON held, that if there had been evidence that the negro was a slave, plaintiff might have recovered the price for which he had been sold. Mr. Justice TRUMBULL, however, held that, as the sale of the negro was made in this State, a recovery could not be had, but Chief Justice TREAT held that plaintiff was entitled to recover on the note, although the sale was made in this State, and dissented from the conclusion at which the other members of the court had arrived. These cases fully establish the fact that a case of this character is not an exception to the rule, and hence they are referred to as not only recognizing the fact, but as requiring us to so hold ; although, it might have been otherwise had the contract been entered into within this State and been wholly governed by our laws.

We do not conceive it to be reasonable to hold that because slavery has been abolished, and become unlawful in the State of Kentucky, therefore this contract has become illegal. It does not follow, because slavery was expressly abolished, that the obligation of the contract was impaired by implication. Such consequences cannot be inferred, as no language

employed for the abolition of slavery can be construed to render notes given for the purchase of a slave inoperate and void. If the abolition of slavery could have such an effect, then all persons who had paid money or property might sue for and recover it back, as having been paid without consideration. Such consequences could never have entered into the contemplation of those who abolished slavery. And courts will not hold laws to have a retro-active operation from mere construction. This is a familiar principle in our jurisprudence, and much less so when to do so would impair the obligation of a contract, which no State can do, and it may well be doubted whether Congress possesses such transcendent power. The facts in this case fail to establish a defense, and the judgment of the court below must be reversed and the cause remanded.

*Judgment reversed.*